*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | |
|---|---|
| *AMANDA L. IRELAND,* ) | |
| ) | |
| *Plaintiff* ) | |
| ) | |
| *v.* ) | *No. 1:16-cv-00376-JDL* |
| ) | |
| *NANCY A. BERRYHILL,* ) | |
| *Acting Commissioner of Social Security,*[1] ) | |
| ) | |
| *Defendant* ) | |

**REPORT AND RECOMMENDED DECISION**[2]

This Child's Disability Benefit ("CDB") and Supplemental Security Income ("SSI") appeal

raises the question of whether the administrative law judge supportably found the plaintiff capable

of performing work existing in significant numbers in the national economy.  The plaintiff seeks

remand on the bases that the administrative law judge ("ALJ") erred in failing to (i) find that she

had a severe impairment of panic disorder with agoraphobia, (ii) evaluate whether her impairments

met or equaled the criteria of Listing 12.05, Appendix 1 to Subpart P, 20 C.F.R. § 404 (the

"Listings"), or (iii) formulate a residual functional capacity ("RFC") supported by substantial

evidence.  *See* Statement of Specific Errors ("Statement of Errors") (ECF No. 13) at 1-11.  I find

no reversible error and, accordingly, recommend that the court affirm the commissioner's decision.

---

[1] Nancy A. Berryhill, who is now the Acting Commissioner of Social Security, is substituted for former Acting Commissioner Carolyn W. Colvin as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d).

[2] This action is properly brought under 42 U.S.C. §§ 405(g) and 1383(c)(3).  The commissioner has admitted that the plaintiff has exhausted her administrative remedies.  The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2), which requires the plaintiff to file an itemized statement of the specific errors upon which she seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office, and the commissioner to file a written opposition to the itemized statement.  Oral argument was held before me on March 17, 2017, pursuant to Local Rule 16.3(a)(2)(D), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

Pursuant to the commissioner's sequential evaluation process, 20 C.F.R. §§ 404.1520, 416.920; *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the ALJ found, in relevant part, that the plaintiff had not yet attained age 22 as of June 1, 2010, her alleged onset date of disability, and had not engaged in substantial gainful activity since that date, Findings 1-2, Record at 12; that she had a severe impairment of borderline intellectual functioning, Finding 3, *id.* at 13; that she did not have an impairment or combination of impairments that met or medically equaled the criteria of any of the Listings, Finding 4, *id.*; that she had the RFC to perform a full range of work at all exertional levels, but with the following nonexertional limitations: simple jobs with simple instructions and limited changes, and the performance of only limited reading or arithmetic, Finding 5, *id.* at 14; that, considering her age (20 years old, defined as a younger individual, on her alleged disability onset date, June 1, 2010), education (at least high school), work experience (transferability of skills immaterial), and RFC, there were jobs existing in significant numbers in the national economy that she could perform, Findings 7-10, *id.* at 17; and that she, therefore, had not been disabled from June 1, 2010, through the date of the decision, May 22, 2015, Finding 11, *id.* at 18-19. The Appeals Council declined to review the decision, *id.* at 1-3, making the decision the final determination of the commissioner, 20 C.F.R. §§ 404.981, 416.1481; *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The ALJ reached Step 5 of the sequential evaluation process, at which stage the burden of proof shifts to the commissioner to show that a claimant can perform work other than her past relevant work. 20 C.F.R. §§ 404.1520(g), 416.920(g); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Goodermote*, 690 F.2d at 7. The record must contain substantial evidence in support of the commissioner's findings regarding the plaintiff's RFC to perform such other work. *Rosado v. Secretary of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

The statement of errors also implicates Steps 2, 3, and 4 of the sequential evaluation process. Although a claimant bears the burden of proof at Step 2, it is a *de minimis* burden, designed to do no more than screen out groundless claims. *McDonald v. Secretary of Health & Human Servs.*, 795 F.2d 1118, 1124 (1st Cir. 1986). When a claimant produces evidence of an impairment, the commissioner may make a determination of non-disability at Step 2 only when the medical evidence "establishes only a slight abnormality or [a] combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered." *Id.* (quoting Social Security Ruling 85-28).

At Step 3, a claimant bears the burden of proving that her impairment or combination of impairments meets or equals a listing. 20 C.F.R. §§ 404.1520(d), 416.920(d); *Dudley v. Secretary of Health & Human Servs.*, 816 F.2d 792, 793 (1st Cir. 1987). To meet a listing, the claimant's impairment(s) must satisfy all criteria of that listing, including required objective medical findings. 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). To equal a listing, the claimant's impairment(s) must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

At Step 4 of the sequential evaluation process, the claimant bears the burden of proving inability to return to past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Bowen*, 482 U.S. at 146 n.5. At this step, the commissioner must make findings of the plaintiff's RFC and the physical and mental demands of past work and determine whether the plaintiff's RFC would permit performance of that work. 20 C.F.R. §§ 404.1520(f), 416.920(f); Social Security Ruling 82-62 ("SSR 82-62"), reprinted in *West's Social Security Reporting Service* Rulings 1975-1982, at 813.

## I. Discussion

### A. Failure To Find Severe Impairment of Panic Disorder with Agoraphobia

The plaintiff first argues that the ALJ erred at Step 2 in failing to consider whether she had a severe impairment of panic disorder with agoraphobia. *See* Statement of Errors at 1-5. She contends that the finding of no such severe impairment was inconsistent with the ALJ's Step 3 determination that she had moderate limitations in social functioning, which in turn was inconsistent with her Step 4 omission of any social functioning restrictions from the plaintiff's RFC. *See id.* I find no error.

As the plaintiff acknowledges, *see id.* at 1-2, while the ALJ did not address whether she had a severe panic or social anxiety disorder at Step 2, she did so elsewhere in her decision, discussing both the alleged social anxiety and the expert opinion evidence of record bearing on it, *see* Record at 16.[3] That evidence consisted of two opinions furnished in connection with a prior disability application – a report of an October 18, 2011, psychological evaluation by agency examining consultant David W. Booth, Ph.D., and an October 26, 2011, opinion of agency nonexamining consultant Brian Stahl, Ph.D., *see id.* at 72-77, 371-74 – and two opinions furnished

---

[3] The precise nomenclature of the disorder is immaterial. At oral argument, the plaintiff's counsel used the terms "panic disorder" and "anxiety" interchangeably.

in connection with the disability application at issue – a November 9, 2012, opinion of Dr. Stahl, and a December 4, 2013, opinion of agency nonexamining consultant John J. Warren, Ed.D, *see id*. at 92-96, 114-18.

Based on his review of a two-page medical record dated March 15, 2011, a mental status examination, an interview of the plaintiff, and administration of the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV"), Dr. Booth diagnosed the plaintiff with panic disorder with agoraphobia and mild mental retardation. *See id*. at 371-74. He noted that the 2011 medical record indicated that the plaintiff "was experiencing symptoms of anxiety[,]" that, on mental status examination, her "affect was anxious[,]" and that, although she initially denied that she had any medical problems when questioned, she stated on further questioning:

> [S]he feels uncomfortable when she is around a number of other people. For instance, she said that if she goes to the mall, she goes in the morning, when there are fewer people present. She said she feels especially uncomfortable if a store is crowded, and she tries to get out as soon as possible.

*Id.* at 371-72.

Summarizing the results of his evaluation, Dr. Booth stated, in relevant part, that "[p]roblems with anxiety are present, which include panic attacks[,]" and that the plaintiff "likely would have difficulty responding to other people in a comfortable and appropriate way, where it would be expected that anxiety would impact on her functioning." *Id.* at 373-74.

In his 2011 opinion, Dr. Stahl found, in relevant part, that the medical evidence supported diagnoses of cognitive disorder and anxiety, which were severe but did not meet or equal a listing, and that the plaintiff had moderate limitations in maintaining social functioning; specifically, that she was "not able to work with the public but can work with coworkers and supervisors." *Id*. at 74, 76. He explained, "She gets along with others and authority. She was polite and cooperative with the field office." *Id*. at 76.

In his 2012 opinion, Dr. Stahl found that the medical evidence supported only one diagnosis, a cognitive disorder that was severe but did not meet or equal a listing. *See id*. at 93. Dr. Stahl noted that he had reviewed two records dated March 7, 2012, and May 7, 2012, both of which indicated that the plaintiff had neither anxiety nor depression. *See id*. at 92, 378-81.[4]

Dr. Stahl explained that he found no medically determinable anxiety impairment because the plaintiff "did not specify allegations of mental health limitations[,]" *id*. at 94 – an apparent reference to his notation that she had alleged auditory processing problems, a learning disability, and a cognitive impairment, *see id*. at 92. He again assessed, *inter alia*, moderate limitations in social functioning, *see id*. at 93, which he translated into an ability "to work with coworkers and supervisors but not with the public[,]" *id*. at 96. He explained, "She gets along with healthcare providers." *Id*.

Dr. Warren also found that the plaintiff had only one severe medically determinable impairment, an organic mental disorder. *See id*. at 115. He explained: "Among the somatic record, anxiety is mentioned, but this appears to have been related to a situation specific experience rather than a general psychopathological condition." *Id*. at 114. Like Dr. Stahl, he assessed, *inter alia*, moderate limitations in social functioning, *see id*. at 93, which he translated into an ability "to sustain the basic demands associated with relating adequately with supervisors/co-workers" but an inability "to interact appropriately with the general public[,]" *id*. at 117.

The ALJ found:

In terms of her allegations of social anxiety, the only mention of this as a problem was in the consultative examination by Dr. Booth and the DDS [Disability Determination Services] reports relying on that evaluation. This appears to be based only on the [plaintiff's] complaints that she feels uncomfortable around groups of people. Despite her allegations, she has never been treated for a

---

[4] In a separate portion of the March 7, 2012, record, a pelvic exam was noted to be difficult "due to anxiety of the patient." Record at 382.

psychiatric impairment, takes no medication for same, had no apparent issues in high school with social interactions, has been determined to be shy but cooperative in evaluations and manages to [go] out with her family and friends without apparent difficulty. The undersigned concludes that the [plaintiff's] allegations of social difficulty are not supported in the medical evidence or even in her function report or in her initial allegations, which included only alleged learning disability, auditory processing and cognitive impairment.

*Id*. at 16 (citation omitted).

She gave "some weight" to the Warren and 2012 Stahl opinions but did "not give great weight [to] their opinions that the [plaintiff] could not work with the public." *Id*. She explained, "There is no evidence that the [plaintiff] would not be able to get along with the public, other than her assertions[,]" and "[s]he has not been in any mental health treatment for social anxiety or any other psychological impairment." *Id*. She gave "some weight" to the Booth opinion but found that "his conclusion about the [plaintiff's] being unable to work with the public is not supported in the medical evidence and appears to rely on [her] subjective complaints." *Id*. at 16-17.

Yet, as the plaintiff points out, *see* Statement of Errors at 2, in assessing the overall severity of her mental limitations for purposes of determining whether her condition met or equaled Listing 12.02, the ALJ found that she had moderate limitations in social activities, stating:

She reports feeling uncomfortable around a number of other people such as in the mall or crowded stores. However, she does report going to the mall when few people are around and can shop with a list for food. [She] has several friends that she does things with and is on Facebook at times.

*Id.* at 13 (citation omitted).

The plaintiff contends that the ALJ's omission of any severe panic or anxiety disorder is unsupported by substantial evidence in that the ALJ (i) overlooked "additional references" in the medical record to her anxiety, *see* Statement of Errors at 4 (citing Record at 351), and (ii) rejected the agency consultants' unanimous opinion that she could not interact with the public while herself assessing moderate limitations in social functioning, *see id*. at 5. She asserts that, as a result, the

ALJ impermissibly interpreted raw medical data to determine whether the panic/anxiety condition was severe. *See id.*; *Iezzi v. Astrue*, Civil No. 09-10-P-S, 2009 WL 3615018, at *3 n.4 (D. Me. Oct. 27, 2009) (rec. dec., *aff'd* Nov. 18, 2009) ("The [ALJ], as layperson, was not competent to judge on the basis of the raw medical evidence that the plaintiff's dizzy spells would have no more than a minimal effect on her ability to work[,]" rendering the impairment nonsevere at Step 2). She argues that the error is not harmless because, with the addition of this second severe impairment, her condition would have met Listing 12.05(C). *See* Statement of Errors at 5.

As the commissioner rejoins, *see* Defendant's Opposition to Plaintiff's Itemized Statement of Specific Errors ("Opposition") (ECF No. 17) at 3-8, the ALJ's finding that the plaintiff had no severe panic or anxiety disorder is supported by substantial evidence in the form of the 2012 Stahl and 2013 Warren opinions as well as her discussion of the record evidence generally.

Although, as the plaintiff's counsel contended at oral argument, Dr. Stahl's explanation for why he found no medically determinable anxiety disorder in 2012 is weak, *see* Record at 94 (plaintiff did not allege she suffered from anxiety), the ALJ reasonably deemed Dr. Warren's explanation "clear and thorough[,]" *id.* at 16, 114.

The plaintiff identifies only one mention of anxiety in the treatment records – a March 11, 2011, notation of "[a]nxiety" with "[n]o sleep disturbances[,]" *id.* at 351, which was taken into account by Dr. Booth, *see id.* at 371. The commissioner correctly observes that the updated evidence available to Dr. Stahl in 2012 and to Dr. Warren in 2013 included a March 7, 2012, treatment record indicating no anxiety or depression on a review of systems, although the plaintiff did experience anxiety related to a pap smear/pelvic examination that day, and a June 14, 2013, record that did not identify anxiety as an issue. *See* Opposition at 4; Record at 380-82, 409.

As the ALJ found, the plaintiff was noted to be shy, but cooperative. *See id.* at 16, 302 (description of plaintiff by a friend as "very shy"), 371 (notation by Dr. Booth that plaintiff was "shy"). Further, as the ALJ noted, the plaintiff did not initially allege that she suffered from anxiety or panic disorder with agoraphobia. *See, e.g., id.* at 16, 92.

In sum, the ALJ identified substantial evidence in support of a finding that the plaintiff had no severe anxiety or panic disorder, distinguishing this case from *Iezzi*, in which the ALJ failed to address whether the claimant's dizziness impairment was severe. *Compare Iezzi*, 2009 WL 3615018, at *3.

As the commissioner suggests, *see* Opposition at 8, the fact that Drs. Stahl and Warren assessed a restriction against contact with the public is not necessarily inconsistent with their determination that the plaintiff had only one severe cognitive mental impairment. Dr. Warren, in particular, provided a cogent explanation for why he found no severe anxiety impairment, *see* Record at 114, yet he went on to deem the plaintiff unable to work with the public, *see id*. at 117. For the court to conclude that Drs. Stahl and Warren could not properly have assessed any social functional restriction unless they found a severe anxiety or panic disorder risks substituting the court's lay judgment for that of experts.

As the commissioner argues, *see* Opposition at 8, any error by the ALJ in assessing a moderate limitation in social functioning at Step 3 but omitting to assess any corresponding restriction at Step 4 does not undermine the supportability of her separate Step 2 finding that the plaintiff had no severe panic or anxiety disorder.

Finally, even assuming *arguendo* that the ALJ erred in failing to find a severe anxiety or panic disorder, for the reasons discussed below, the error was not outcome-determinative as to Listing 12.05(C).

## B. Failure To Consider Listing 12.05

The ALJ found at Step 3 that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any listed impairment, specifically addressing Listing 12.02 (Organic Mental Disorders). *See* Record at 13-14. The plaintiff asserts that she erred in failing to consider Listing 12.05(C) (Intellectual Disability). *See* Statement of Errors at 6-9.[5] The commissioner counters that, although the ALJ did not address that listing, her analysis supports a finding that the plaintiff's impairment did not meet it. *See* Opposition at 9-14. I agree.

To meet Listing 12.05, a claimant must demonstrate that she has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22." Listing 12.05. "The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied." *Id*. The plaintiff relies on subsection C, pursuant to which a claimant must demonstrate "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Listing 12.05(C).

The plaintiff contends that her impairment meets this listing on the basis of (i) Dr. Booth's finding, on administration of the WAIS-IV before she turned 22, that she had a full-scale IQ score of 65, in the mild range of mental retardation, (ii) record evidence of numerous deficits in adaptive functioning before age 22, and (iii) the existence of a separate mental impairment imposing an

---

[5] The plaintiff acknowledges that, although the commissioner has published final rules revising medical criteria for evaluating mental disorders, they did not take effect until January 17, 2017. *See* Statement of Errors at 6 n.1; Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138 (Sept. 26, 2016). Accordingly, I discuss the version of Listing 12.05 in effect at the relevant time.

additional and significant work-related limitation of function, namely, panic disorder with agoraphobia, as diagnosed by Dr. Booth. *See* Statement of Errors at 6-9.

As discussed above, the ALJ supportably found that the plaintiff did not have a severe impairment of panic disorder with agoraphobia. Should the court agree, that is fatal to her bid for remand on this basis.

In any event, as the commissioner argues, *see* Opposition at 9-11, the Booth finding is not dispositive of the issue of the plaintiff's IQ. The plaintiff omits mention of conflicting IQ evidence in the form of a December 15, 2006, report by psychologist Normal O. Worgull, Jr., Ph.D., based on administration of the Wechsler Intelligence Scale for Children – Fourth Edition ("WISC-IV"), that the plaintiff had a full-scale IQ score of 72, within the borderline range of intellectual functioning. *See* Record at 347-50.

As the commissioner notes, *see* Opposition at 9-10, an ALJ is not required to accept an IQ score as valid when other evidence undermines it, *see, e.g.*, *Plourde v. Barnhart*, No. 02-164-B-W, 2003 WL 22466176, at *4 n.4 (D. Me. Oct. 31, 2003) (rec. dec., *aff'd* Nov. 18, 2003) ("[I]t is appropriate for an administrative law judge to consider the record in its totality (including evidence of the claimant's functioning), in assessing the validity of a stated IQ score[.]"); *see also, e.g.*, *Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir. 2005) ("An ALJ may reject IQ scores that are inconsistent with a claimant's daily activities and behavior, especially when the scores are based on a one time examination by a nontreating psychologist."). In a similar vein, an ALJ permissibly may resolve differences in findings regarding intellectual functioning. *See, e.g., Libby v. Astrue*, 473 Fed. Appx. 8, 9 (1st Cir. 2012) (noting that it was "the ALJ's prerogative" to resolve conflicts in the evidence concerning whether the plaintiff was mentally retarded).

The ALJ gave "great weight" to the Booth opinion insofar as it bore on the plaintiff's cognitive abilities, deeming it "supported by objective medical evidence, including tests he performed[,]" and "some weight" to the Worgull opinion, which she found "consistent with the medical opinions of record regarding [the plaintiff's] cognitive functioning." Record at 16-17.

Taken in isolation, that discussion suggests that the ALJ afforded more weight to the Booth test findings than to those of Dr. Worgull. As the commissioner persuasively argues, however, *see* Opposition at 10-11, the ALJ's discussion of the record evidence generally, and her finding that the plaintiff had a severe impairment of borderline intellectual functioning rather than mild mental retardation, indicate that she implicitly found Dr. Worgull's IQ scores to be more reflective of the plaintiff's level of intellectual functioning, *see* Finding 3, Record at 13; *see also id*. at 15-17. In relevant part, the ALJ concluded:

> [T]he record consistently shows the [plaintiff] to have cognitive limits in the borderline to mild mental retardation range. The subtest scores vary, especially in terms of processing speed. However, the [plaintiff] was able to graduate from high school, albeit with some help from special education services. The record also establishes that she can perform some household tasks with reminders from her mother. The record also shows that little has been expected of the [plaintiff]. She has never had a part time job, nor was she involved in vocational rehabilitation programs after school as Dr. Worgull recommended. In all her psychological evaluations, she had no vocational goals and appeared not to have an expectation that she would work, even though she attended a program through the high school for two years regarding vocational training in culinary arts. [She] testified that she only did dishes in that program. . . . The fact that she can microwave meals and follow instructions to bake cookies or cake suggests that she is capable of following simple instructions. She was noted to be cooperative and a hard worker in her 2006 P.E.T. [Pupil Evaluation Team] discussion. She was noted to excel at clothing design and put forth a strong effort. She was also noted to work well with others and use her time wisely. Moreover, her P.E.T. report from tenth grade indicates one of her goals was to attend Vocational Rehabilitation courses.
>
> While the undersigned limited her mental residual functional capacity assessment to limited reading and arithmetic[,] her P.E.T. records showed she was in the average range (10th grade) in reading comprehension and oral expression and only slightly below average in written expression and listening comprehension. She was able to read common sight words. She was able to perform simple addition and

subtraction. Moreover, her overall grade point average in high school was 85.25 and she graduated 60th out of 110. Her coursework included subjects such as earth science, biology, chemistry, geometry and algebra, suggesting she would at least be capable of simple work with simple instructions and limited arithmetic and reading.

*Id*. at 15-16 (citations omitted).

In addition, the ALJ deemed Dr. Warren's opinion, apart from his assessment of a restriction against working with the public, "consistent with the medical evidence of record" and supported by a "clear and thorough" explanation. *Id*. at 16. Dr. Warren explained, in relevant part:

Claimant with history of learning problems, intelligence testing obtained in connection with prior denial 10/11 suggested intellectual disability, however, other school-based evidence, including intelligence and achievement testing[,] supports learning disorder or perhaps borderline intellectual functioning rather than frank intellectual disability.

*Id*. at 114.

The ALJ, hence, identified substantial evidence in support of a finding that the plaintiff's IQ was consistent with a finding of borderline intellectual functioning rather than mild mental retardation.

Finally, while the ALJ did not purport to discuss whether, for purposes of Listing 12.05, the plaintiff demonstrated "deficits in adaptive functioning initially manifested" before age 22, her conclusions regarding the plaintiff's functioning are inconsistent with such a finding.

This court has observed:

"Adaptive functioning" is ordinarily associated with activities of daily living. The Commissioner's preamble to the listings of mental disorders defines activities of daily living to "include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using the post office. . . . In a nut shell, the standard requires an assessment of a claimant's ability to appropriately engage in day-to-day activities of independent living.

13

*Richardson v. Social Sec. Admin. Comm'r*, No. 1:10-cv-00313-JAW, 2011 WL 3273140, at *7 (D. Me. July 29, 2011) (rec. dec. *aff'd* Aug. 18, 2011) (quoting Listing 12.00(C)(1)). "[L]isting 12.05 does not require 'significant' deficits in adaptive functioning, only deficits." *Id*. at *8.

The plaintiff asserts that the record reflects numerous deficits in her adaptive functioning manifested before age 22, pointing to portions of Dr. Booth's report as well as her testimony at hearing. *See* Statement of Errors at 7-8. She observes that Dr. Booth stated that (i) she had "a constricted lifestyle" and that her activities of daily living were "concomitantly limited[,]" (ii) her mother "coached her on many items, as she filled out the intake form for the office[,]" and (iii) she would "require help in the specifics of money management." *Id*. (quoting Record at 371, 373).

She adds that, at hearing, she testified that she was unable to shop without a list, *see* Record at 51, could not prepare meals that did not involve using the microwave, *see id*. at 47, did not have a checkbook, *see id*. at 55, could only tell time using a digital clock, *see id*. at 54, could not subtract one from five without counting on her fingers, *see id*. at 54-55, needed her mother's help to operate the washing machine, *see id*. at 48, she did not have a driver's license and failed her permit test several times before passing it, *see id*. at 49-50, participated in special education classes throughout her schooling, *see id*. at 42, and was accompanied by a one-on-one aide in all of her classes, *see id*.

As counsel for the commissioner pointed out at oral argument, to the extent that the plaintiff relies on her testimony concerning her limitations, the ALJ deemed it not entirely credible, *see id*. at 15, and she has not contested that credibility finding, *see generally* Statement of Errors.

Moreover, as the commissioner contends, *see* Opposition at 11-13, the ALJ discussed in detail why, in her view, the evidence suggested that the plaintiff was capable of a higher level of functioning than alleged and that "little ha[d] been expected of her[,]" Record at 15-16. For

example, the ALJ noted that (i) Dr. Worgull had indicated that the plaintiff might be a good candidate for vocational training and that undertaking such training might improve her self-esteem, *see id*. at 15, 350, (ii) the plaintiff required an in-class aide solely for regular-education high school classes, *see id*. at 15, 255, 350, and, (iii) with the aide's assistance, the plaintiff took such courses as earth science, biology, chemistry, geometry, and algebra, maintaining an 85.25 grade point average and graduating from high school roughly in the middle of her class, *see id*. at 16, 247. As the commissioner observes, *see* Opposition at 12, "assignment to special education classes may be evidence of the necessary adaptive function deficit, but it is not enough, standing alone, if the claimant did well in those classes[,]" *Wallace v. Astrue*, No. 1:11-cv-260-DBH, 2012 WL 1077454, at *3 n.2 (D. Me. Mar. 29, 2012) (rec. dec., *aff'd* Apr. 17, 2012) (citations and internal quotation marks omitted).

Finally, the ALJ deemed the plaintiff to have only mild limitations in activities of daily living, stating that she "does some household chores including cooking and baking, laundry and dishes[,]" "uses the family computer and goes on Facebook and plays video games[,]" "likes to go to the beach in summer and skis in the winter with her family[,]" and "liked sewing" in school. *Id.* at 13. *See also id*. at 15-16 (finding that the plaintiff "can perform some household tasks with reminders from her mother[,]" and "[t]he fact that she can microwave meals and follow instructions to bake cookies or cake suggests that she is capable of following simple instructions").

Because the ALJ's discussion makes clear that she would have supportably found that the plaintiff did not meet Listing 12.05(C) had she expressly considered that listing, any error in failing to do so was harmless.

### C. The ALJ's RFC Finding

The plaintiff finally seeks remand on the basis that, in assessing her RFC, the ALJ erred in failing to include any limitations in her ability to interact with coworkers, supervisors, or the general public or to identify accurately the extent of her limitations in reading and following instructions. *See* Statement of Errors at 9-11. She contends that these errors undermined the relevance of a vocational expert's ("VE's") testimony that a person with the RFC posited by the ALJ was capable of performing work existing in significant numbers in the national economy. *See id.* at 11. For the reasons that follow, I find no reversible error in the ALJ's failure to include a prohibition against working with the general public and no error in any of the remaining respects argued by the plaintiff.

#### 1. Interacting with Coworkers and Supervisors

As the commissioner rejoins, *see* Opposition at 7 n.6, the plaintiff points to no evidence that she had limitations in interacting with coworkers or supervisors apart from Dr. Booth's general statement that she "[l]ikely would have difficulty responding to other people in a comfortable and appropriate way, where it would be expected that anxiety would impact on her functioning[,]" Statement of Errors at 10; Record at 374. With the benefit of review of the Booth report as well as other then-available evidence of record, both Drs. Stahl and Warren deemed the plaintiff capable of interacting with coworkers and supervisors. *See* Record at 76, 96, 117. The ALJ did not err in omitting to assess such a restriction.

#### 2. Interacting with the General Public

On the other hand, as the commissioner acknowledges, *see* Opposition at 6-7, there is a tension between the ALJ's own finding of moderate limitations in social functioning, tracking the opinions of Drs. Stahl and Warren, *compare id.* at 13 *with id.* at 74, 93, 115, and her omission of

the restriction assessed by both Drs. Stahl and Warren against working with the public, *compare* Finding 5, *id*. at 14 *with id*. at 76, 96, 117.  Absent any explanation for the discrepancy, the ALJ erred in omitting that restriction.

As the commissioner points out, however, *see* Opposition at 7-8 & n.7, the error is harmless for two alternative reasons.  First, two of the three jobs that the ALJ found the plaintiff capable of performing, those of linen grader and kitchen helper, do not require public contact.  *See Gleason v. Colvin*, No. 1:15-cv-12-NT, 2015 WL 7013661, at *5 (D. Me. Oct. 15, 2015) (rec. dec., *aff'd* Nov. 12, 2015) (linen grader); *Connor v. Colvin*, No. 1:13-cv-00219-JAW, 2014 WL 3533466, at *4 (D. Me. July 16, 2014) (kitchen helper).  This court "has routinely held that a single job available in significant numbers in the national economy is sufficient to meet the commissioner's burden at Step 5." *Dana v. Astrue*, Civil No. 09-514-BW, 2010 WL 3397465, at *3 (D. Me. Aug. 24, 2010) (rec dec., *aff'd* Sept. 13, 2010).  Thus, had the ALJ assessed a limitation against working with the public, she could have continued to rely on the jobs of linen grader and kitchen helper, meeting the commissioner's burden at Step 5.

Second, pursuant to *Ward v. Commissioner of Soc. Sec*., 211 F.3d 652 (1st Cir. 2000), remand on this point would constitute an "empty exercise[,]" *Ward*, 211 F.3d at 656, because the same result would be reached pursuant to the so-called "Grid," the Medical-Vocational Guidelines contained in Appendix 2 to Subpart P, 20 C.F.R. § 404, which provide a "streamlined" method by which the commissioner can meet her burden of showing that there is other work a claimant can perform, *Heggarty v. Sullivan*, 947 F.2d 990, 995 (1st Cir. 1991) (citation and internal quotation marks omitted).

In *Ward*, the First Circuit held that remand is not necessary if correction of the error at issue will amount to no more than an empty exercise because there is an independent ground, based

on a fully developed record, on which affirmance "must be entered as a matter of law." *Ward*, 211 F.3d at 656. *See also, e.g., Day v. Astrue,* No. 1:12-cv-141-DBH, 2012 WL 6913439, at *10 (D. Me. Dec. 30, 2012) (rec. dec., *aff'd* Jan. 18, 2013) ("Pursuant to the rule of *SEC v. Chenery Corp.,* 332 U.S. 194 (1947), a reviewing court cannot affirm an agency's decision on the basis of a *post hoc* rationalization but must affirm, if at all, on the basis of a rationale actually articulated by the agency decision-maker. An exception to the *Chenery* rule exists when a remand will amount to no more than an empty exercise because, for example, application of the correct legal standard could lead to only one conclusion.") (citations and internal punctuation omitted).

As the commissioner points out, *see* Opposition at 18, the ALJ found the plaintiff capable, despite her limitations, of performing the basic mental demands of competitive, remunerative, unskilled work, defined in Social Security Ruling 85-15 ("SSR 85-15") to "include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting[,]" Record at 18; SSR 85-15, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991, at 347. Even with the addition of a ban against interaction with the public, the use of the Grid remains appropriate for an individual who retains the ability to perform those basic mental demands. *See, e.g., Garcia-Martinez v. Barnhart*, 111 Fed. Appx. 22, 23 (1st Cir. 2004); *Swormstedt v. Colvin*, No. 2:13-cv-00079-JAW, 2014 WL 1513347, at *6 (D. Me. Apr. 16, 2014).

As the commissioner points out, *see* Opposition at 19, even if one assumes that the plaintiff had no transferable skills and the lowest educational level, to account for her limitations to simple reading and arithmetic, the Grid directs a finding of nondisability for an individual in her age category, *see* Grid §§ 201.23, 202.16, 203.25.

### 3. Reading Ability

With respect to her reading ability, the plaintiff notes that, during the hearing, the VE testified that the three jobs at issue (cleaning/housekeeper, linen grader, and kitchen helper) all require the ability to recognize "somewhere in the neighborhood of 2,500 two[-] to three-syllable words . . . at a rate of 95 to 120 words per minute." Statement of Errors at 10 (quoting Record at 57-58). She notes that, although the ALJ found that she "was able to read common sight words[,]" she made no findings regarding her ability to read two- to three-syllable words and at what rate. *Id*. (quoting Record at 16). She asserts that the "only quantitative evidence" of record regarding her reading level, a report of an evaluation performed for purposes of her P.E.T. plan, stated that she "was able to read common sight words, but multi-syllabic words with multiple vowels and silent letters gave her more difficulty[,]" and she also did well with one-syllable words in pseudoword decoding "but had difficulty with multi-syllabic words and those words with double vowels." *Id*. at 10-11 (quoting Record at 246).

The ALJ asked the VE to assume a hypothetical person "with a high school education in special ed, so there's limited reading and math skills." Record at 55. She went on: "I don't know, is that clear enough for you when I say limited? She can . . . read simple material[.]" *Id*. at 55-56. On cross-examination, the VE testified that the three jobs he had identified required reading at a "quite basic" level that "[c]ertainly would not require a sophisticated level of reading." *Id*. at 57. He elaborated that, as defined in the *Dictionary of Occupational Titles* ("DOT") (U.S. Dep't of Labor 4th Ed. 1991), the jobs had a General Educational Development ("GED") reading level of 1, equating to an ability to "recognize the meaning of 2,500 two[-] or three-syllable words . . . at a rate of 95 to 120 words per minute." *Id*. at 57-58. He agreed that an inability to read those words at that rate "would take you outside of those jobs[.]" *Id*. at 58.

As the commissioner observes, *see* Opposition at 16, the ALJ relied on the same P.E.T. evaluation report on which the plaintiff relies, *see* Record at 16, 246. That report does not necessarily indicate that the plaintiff is unable to meet GED reading level 1 requirements: while the examiner stated that reading multisyllabic words gave the plaintiff "more difficulty[,]" she did not indicate that the plaintiff could not read them. *Id*. at 246. In addition, as the ALJ observed, *see id*. at 16, the examiner noted that the plaintiff "scored in the average range in reading comprehension and oral expression[,]" albeit below average in wording reading and pseudoword decoding, *id*. at 246. Further, as the ALJ found, *see id*. at 16, the examiner stated that the plaintiff "did fine with common sight words," *id*. at 246.

As the commissioner points out, *see* Opposition at 16-17, the VE did not testify that a person with the hypothetical profile provided by the ALJ could not perform the reading requirements of the jobs at issue, but only that an individual who could not meet the standards of a GED reading level 1, as defined in the DOT, could not perform them, *see* Record at 57-58. There is no evidence that the plaintiff could not read in accordance with those standards, and that lack of evidence cuts against, rather than in favor of, the plaintiff, who bore the burden of proof at Step 4. *See, e.g., Davis v. Colvin*, No. 1:14-cv-343-JHR, 2015 WL 3937423, at *4 (D. Me. June 25, 2015) ("[T]he burden of proof rests with the claimant through the establishment of an RFC.").

In any event, as the commissioner argues in the alternative, *see* Opposition at 16 n.12, her regulations specify that even illiteracy or an inability to communicate in English is not a complete bar to gainful employment, *see, e.g.*, *Seavey v. Barnhart*, 276 F.3d 1, 6 n.3 (1st Cir. 2001) (noting that the regulations do not consider illiteracy a disability, nor a condition that significantly limits the jobs available); Grid § 201.00(i) ("[T]he primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the

unskilled level, literacy or ability to communicate in English has the least significance.").  As she

notes, *see* Opposition at 19 n.13, even if the plaintiff were illiterate and limited to sedentary work,

neither of which is the case, in addition to having no prior work experience, the Grid would direct

a finding of nondisability for a person in her age category, *see* Grid § 201.23.

### 4.  Ability To Follow Instructions (Asserted Need for Aide)

The plaintiff finally contends that the ALJ erred in omitting a need for a one-on-one aide

in the workplace, noting that, at hearing, the VE testified that an individual requiring such an

accommodation would not be able to obtain or maintain employment.  *See* Statement of Errors at

11; Record at 56-57.  She observes that she was accompanied by a one-on-one aide throughout her

school career and testified at hearing that the aide would help her follow along with the class

because "[a] lot of the stuff in the class I did not even understand, so she would sit there and give

me – she would explain what to do."  Statement of Errors at 11 (quoting Record at 43).  At oral

argument, her counsel further emphasized that Dr. Booth had noted that she looked to her mother

for answers.  *See* Record at 371 ("The [plaintiff] came to the office with her mother, who coached

her on many items, as she filled out the intake form for the office.").

As the commissioner rejoins, *see* Opposition at 14, the plaintiff advances no rationale for

the proposition that her need for an aide at school would translate into a need for an aide in

performing unskilled work.  Indeed, the plaintiff's school program was intended to prepare her for

vocational programs and, ultimately, work.  *See, e.g*., Record at 255 (noting that the plaintiff had

"done very well . . . in the culinary arts program, earning A's for her first two terms[,]" but

continued "to prefer a career in animal/veterinarian work").  Nor does the plaintiff point to any

medical opinion that she would require a one-on-one aide to perform unskilled work.  *See*

Statement of Errors at 11.  The plaintiff's general dependence on her mother likewise does not

evidence a need attributable to her mental impairment for a one-on-one aide to perform unskilled work.  Again, this lack of evidence cuts against, rather than supporting, the plaintiff's position. *See, e.g., Davis*, 2015 WL 3937423, at *4.

Remand, accordingly, is unwarranted on the basis of any of the plaintiff's points of error.

## II. Conclusion

For the foregoing reasons, I recommend that the commissioner's decision be **AFFIRMED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 25th day of June, 2017.


/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge